UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TYEAST M. EDMOND,** | No. 11–cv–2805 (KM)(JBC) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **PLAINFIELD BOARD OF EDUCATION,** | |
| **Defendant.** | |

### KEVIN MCNULTY, U.S.D.J.:

The plaintiff, Tyeast M. Edmond, is a social worker for the defendant Plainfield Board of Education ("the Board"). Over the course of her tenure, plaintiff contends, she was subjected to hostile, discriminatory and retaliatory behavior by her supervisors and coworkers. Ms. Edmond alleges that the Board should be liable under Title VII for racial discrimination, a hostile workplace environment, retaliation, and constructive termination. She also alleges tort claims, including invasion of privacy and intentional infliction of emotional distress.

Now before the Court is the Board's motion for summary judgment as to all counts. For the reasons stated herein, it will be granted in part and denied in part.

1

# I.     BACKGROUND

## A. Relevant Facts

### 1. Evergreen School

The Board hired Ms. Edmond to be a social worker at the Evergreen School in 2004. (Board Facts ¶ 2; Edmond Facts 23)[1] In the fall of 2008, the Board made Wilson Aponte principal of Evergreen. (Board Facts ¶ 5; Edmond Facts 23). Mr. Aponte and Ms. Edmond quickly clashed. On December 10, 2008, Ms. Edmond wrote a letter to her union representative detailing three instances in which Mr. Aponte was very abrasive. (Ex. 20) On March 31, 2009, Ms. Edmond picked up a complaint form from the Board's Office of administrative Services, and on April 3, 2009, Ms. Edmond filed a complaint

---

[1] Citations to the record will be abbreviated as follows:

"Compl." — Complaint (ECF No. 1)

"Supp. Compl." — Plaintiff's Amended/Supplemental Complaint (ECF No. 49)

"Ex. _" — if followed by a number then Defense's Exhibits (ECF No. 75–2 to 75–7 containing only Defense exhibits 1–14 as defendants failed to electronically file exhibits 15–41); if followed by a letter then Plaintiff's Exhibits (ECF No. 81–4 to 81–7)

"Board Br." — Brief of the Board in Support of Defendant's Motion for Summary Judgment (ECF No. 75–1)

"Board Reply" — Reply Brief of the Board to Plaintiff's Opposition to Summary Judgment (ECF No. 82)

"Board Facts" — The Board's Statement of Undisputed Facts Under Local Rule 56.1 (ECF No. 75)

"Edmond Response" — Plaintiff's Response to Board Facts (ECF No. 81)

"Edmond Facts" — Plaintiff's Counterstatement of Material Facts (ECF No. 81–1)

"Edmond Br." — Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 81–2, 81–3)

"Bailey Dep." — Transcript of the Deposition of Dr. Garnell V. Bailey (ECF Nos. 81–5 Ex. F; 82 (adding extra pages to the transcript))

"Pellum Dep." — Transcript of the Deposition of Maria Pellum (ECF No. 81–6 Ex. K)

with the Board's Office of Affirmative Action. (Board Facts ¶¶ 19–21; Ex. 19) That form, which she filed with Dr. Garnell V. Bailey, was entitled "Discrimination/Harassment Complaint Form." (Ex. 19 at 1) In it, Ms. Edmond details that Mr. Aponte was "verbally abusive toward [her]" and "very lenient with other staff members." (Ex. 19 at 3–4) On June 15, 2009, Ms. Edmond filed a charge of discrimination with the EEOC, in which she alleged that Mr. Aponte "harass[ed her], show[ed] favoritism toward staff persons not of [her] race," and that she was replaced by a "Hispanic Social Worker." (Ex. 27 1–2; Board Facts ¶ 22)[2]

One of the incidents complained of in the December 2008 letter involved Ms. Edmond and Milagros Mhenriquez. (Board Facts ¶ 18) Mr. Aponte yelled at both for getting in the way of a parent, even though they did not realize the parent was behind them. (Board Facts ¶ 18; Edmond Response ¶ 18; Ex. 20 at 2–3)

When Ms. Edmond filed her complaint with Dr. Bailey in April 2009, Bailey told Edmond "if you are telling me that he is harassing you, I am going to have to transfer you . . . If I do not move you then the courts will ask me why I let you stay in an environment where you (sic) feeling harassed." (Board Facts ¶ 21 (citing Ex. 23); Edmond Response ¶ 21)

An investigation by the affirmative action office found that Mr. Aponte would speak in Spanish to Spanish-speaking employees, even though they also understood and spoke English. (Bailey Dep. 41:18–3, 53:4–6, 56:12–21) Dr. Bailey found this practice to be insensitive because non-Spanish speaking employees, like Ms. Edmond, could have perceived that Aponte was saying something derogatory even if he was not. (Bailey Dep. 41:18–42:3; 56:16–21)

---

[2] To her motion to amend the complaint, Ms. Edmond attached the resolution of the 2009 EEOC complaint, dated February 28, 2011. (ECF No. 26 at Ex. B) It stated that "the Commission is unable to conclude that the information establishes a violation of federal law on the part of Respondent" and that Ms. Edmond had 90 days to sue the respondent. (*Id.*) Ms. Edmond timely filed her suit on May 16, 2011. (ECF No. 1)

Bailey recommended that Aponte attend sensitivity training. (Bailey Dep. 52:15–18) In Bailey's professional opinion, however, Aponte's speaking Spanish to some employees was not discriminatory. (Bailey Dep. 52:11–14) On June 22, 2009, Dr. Bailey sent Ms. Edmond a memorandum reporting that the investigation of her claims resulted in a determination that her allegations of discrimination were unsubstantiated. (Board Facts ¶ 23; Ex. 28)[3]

 The morning that Ms. Edmond filed her complaint with the affirmative action office, Mr. Aponte sent an email specifically asking Ms. Edmond to attend the third grade level meeting from 9:00 to 10:25 a.m. the following Thursday. (Ex. 40 at 261) Edmond responded with a request to be excused from the meeting at 9:30 a.m. because she had a lot of paperwork, calls, and planning for school events to take care of that day. Aponte denied her request. (Ex. 40 at 262) After the weekend, Edmond sent an email to Aponte recommending that Ms. Eagles be invited to the meeting, but added that Ms. Eagles was only available until 9:30 a.m.. (Ex. 40 263) Mr. Aponte responded: "No problem and Ms. Eagles can provide additional input – keeping in mind that her time maybe (sic) limited." (Ex. 40 at 263)

 In the spring of 2009, Ms. Edmond received three successive notices informing her that she would be transferred to three different schools. The third and last transferred her to Cedarbrook, effective September 1, 2009. (Edmond Response ¶ 21; Exs. G, 24–26)

### 2. Cedarbrook School

 Upon arrival at Cedarbrook, Ms. Edmond was forced to share a small office with Tracey Easley-Card. (Board Facts ¶ 26; Edmond Facts 26–27) They clashed. (Board Facts ¶¶ 27–30; Edmond Response ¶¶ 27–28; Edmond Facts

---

[3] Dr. Bailey also testified that when Dr. Gallon became superintendent of the Board the policies regarding complaints about discrimination "went out the window." (Bailey Dep 108–111) Dr. Gallon became superintendent nine months before Ms. Edmond filed her complaint with the affirmative action office. (Bailey Dep. 110:24–111:3)

27–30) Edmond also clashed with her new principal, Frank Asante, who, at a luncheon near the end of the 2009–10 school year said to the crowd: "This is Cedarbrook. If you mess with any members of this family, you're out. It's not your choice to go, it's mine." (Edmond Facts 30–31 (citing Ex. M at 2)) Edmond felt that this statement was directed towards her, although her name was not used and she was not pointed at. (Edmond Facts 31; Ex. M)

Ms. Edmond again filed a complaint with the affirmative action office (Edmond Facts 31), and on May 13, 2010, she filed an EEOC complaint against Principal Asante and others (Board Facts ¶ 32; Edmond Response ¶ 32; ECF No. 26 at Ex. A). In this EEOC complaint, Edmond alleged that her roles and responsibilities were reduced after she complained to human resources that she was being bullied and harassed by her colleagues. (ECF No. 26 at Ex. A)

On December 10, 2010, Mr. Asante wrote a letter to the superintendent asking for Ms. Edmond's removal from Cedarbrook saying: "I don't understand why she was allowed to come back to Cedarbrook after filing those charges especially since the same behavior had manifested itself in her previous school, prompting her transfer to Cedarbrook in the first place." (Exs. M, 2)

On February 8, 2011, Ms. Edmond's coworker Sandra Dabney filed a discrimination/harassment complaint against Edmond alleging that Edmond often threatened other participants at meetings if they did not agree with her assessment of a situation; that Ms. Edmond's behavior was "disruptive, unpredictable, and intense"; and Dabney she felt "anxious" and "feared for her safety" when working with Edmond. (Board Facts ¶¶ 33–34; Edmond Response ¶¶ 33–34) At a meeting on March 8, 2011, the Board suspended Ms. Edmond indefinitely with pay and mandated that she undergo a psychiatric examination. (Edmond Facts 33; Board Facts ¶¶ 35, 42) The Board's minutes state that they had sufficient evidence based on coworker complaints to find a "genuine and documented concern regarding Edmond's mental health." (Ex. K)

Maria Pellum, an advocate for school board transparency, made her regular request for the minutes from the March 8, 2011 meeting of the Board through New Jersey's Open Public Records Act. (Board Facts ¶ 44; Edmond

Response ¶ 43; Edmond Facts 35) The Board's order that Ms. Edmond submit to a psychiatric evaluation was posted on the internet for a number of hours before Ms. Pellum noticed and removed the minutes from her blog. (Edmond Facts 35; Edmond Response ¶ 43) At her deposition, Pellum claimed that the minutes were redacted when she received them, but the redaction was done poorly and malfunctioned when she uploaded the minutes. Pellum also said that Gary Ottman, the Board's secretary who sent her the minutes, told her that a computer glitch was the cause of the mishap. (Pellum Dep. 20–25)

### B. Claims

In Ms. Edmond's cover letter to her filings in opposition to summary judgment, she admits that evidence was not uncovered as to count three for sex discrimination and count six for Defamation/Libel/Slander. (ECF No. 81) Because it appears that those claims are withdrawn, I GRANT summary judgment as to Counts three and six. In a supplementary or amended complaint, Edmond attempted to add a claim for disability discrimination. Her summary judgment papers, however, say nothing about any disability claim, and do not cite any evidence in support. This claim, too, I regard as withdrawn. (*See* Supp. Compl.) [4]

Eight claims remain:

- Count one for hostile work environment under Title VII;
- Count two for racial discrimination under Title VII;
- Count four for retaliation under Title VII;
- Count five for constructive termination under Title VII;
- Count seven for invasion of privacy;
- Count eight for false light;
- Count nine for bad faith; and

---

[4] Ms. Edmond's opposition brief mentions New Jersey's Law Against Discrimination, but her complaint did not allege any cause of action under that statute. I therefore do not address it.

- Count ten for intentional infliction of emotional distress.

(*See* Compl.) Ms. Edmond also supplemented claims seven, eight, and ten in an amended or supplemental complaint

## II.   ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*,

912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. That "evidentiary burden" is discussed in the following section.

### B. Title VII (Counts 1, 2, 4, 5)

"Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing 42 U.S.C. § 2000e–2(a)(1)). Ms. Edmond's complaint alleges four remaining causes of action under Title VII: (1) racial discrimination, (2) hostile workplace, (3) retaliation, and (4) constructive discharge.

#### 1. Racial Discrimination (Count 2)

Courts evaluate motions for summary judgment on Title VII claims under a specialized burden-shifting regime. For Title VII claims, courts follow the framework set out in the Supreme Court's decision in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).

*McDonnell Douglas* divides the burden of production into three phases, shifting the burden between the plaintiff and the defendant.

**Step 1: The Prima Facie Case.** At the outset, the plaintiff must state a prima facie claim of discrimination. *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013). A prima facie case of racial discrimination encompasses four elements: 1) the plaintiff belonged to a protected class; 2) she[5] was qualified for the position in question; 3) she was subject to an adverse employment action; and 4) the adverse action was taken under circumstances giving rise to an inference of discrimination. *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)[6] (citing *Burton,* 707 F.3d at 426); *accord Shahin v. Delaware*, 543 F. App'x 132, 136 (3d Cir. 2013); *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013).

**Step 2: Legitimate non-discriminatory reason for the termination**.

If the plaintiff states a *prima facie* case, the burden of production shifts to the defendant employer, which must articulate a legitimate basis for the adverse employment action. *Burton,* 707 F.3d at 426; *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x at 153. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton,* 707 F.3d at 426 (internal quotations omitted). Indeed, at this stage, "the defendant need not prove that the articulated reason actually motivated its conduct." *Burton,* 707 F.3d at 426 (internal quotations omitted).

**Step 3: Pretext.** Once the defendant has offered a non-discriminatory reason, the burden of production shifts back to the plaintiff. Now the plaintiff must present evidence to show that the defendant's stated reason is merely a

---

[5] Because the plaintiff here happens to be female, I will use the female pronoun even when referring to a generic plaintiff.

[6] All Court of Appeals cases cited to F. App'x are non-precedential. *See* 3d Cir. IOP 5.3; Fed. R. App. P. 32.1(a).

pretext for discrimination. *Burton*, 707 F.3d at 426. The plaintiff can do that in either of two ways: (1) she can discredit defendant's proffered reason; or (2) she can offer evidence that discrimination was more likely than not a motivating or determinative factor in the adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To meet that burden, the plaintiff may rely on direct or circumstantial evidence. *Id.*

The first method (discrediting the defendant's proffered reasons) is a difficult one for a plaintiff: she must present evidence that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons ... was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999). "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

A plaintiff who opts for the second method (evidence that discrimination was a motivating factor) can provide the required evidence in at least three ways: "by showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

***The Evidence.*** Ms. Edmond has proffered some specific incidents in support of her claim of racial discrimination. I do not believe that she meets her step one burden of establishing a prima facie case, but I will give her the benefit of the doubt, shift the burden to the defendant for step two, and consider her evidence of race discrimination in connection with step three. I nevertheless conclude that Edmond's proffered facts, considered individually and together, fail to rebut the Board's evidence that their actions were taken for ordinary administrative reasons, and were not racially discriminatory.

The main allegations in the complaint and Ms. Edmond's summary judgment briefing to which I refer include the following:

(1) Dr. Bailey's findings upon investigating Ms. Edmond's complaint of harassment that Mr. Aponte's speaking Spanish was insensitive (Edmond Br. 38–39)

(2) Dr. Bailey's deposition testimony that the superintendent did not enforce the district's policies regarding complaints of discrimination. (Edmond Br. 40–41)

(3) Mr. Aponte allowed a Caucasian nurse named Marilyn Eagles to leave a meeting early and denied Ms. Edmond permission to do the same (Compl. ¶ 7);

(4) Aponte met with teachers of other races, but not Edmond, to address the issue of his yelling at them (Compl. ¶ 9);

(5) when there was a quarrel between Edmond and Melinda Sooby, a Hispanic teacher, Aponte showed Edmond less support and concern than he had shown Ms. Sooby on a previous occasion (Compl. ¶ 8);

(6) Aponte sought to have Edmond replaced by a Hispanic social worker and made her life at Evergreen unbearable until she was transferred. (Compl. ¶ 11)

These allegations, even taken at face value, are at best very weak support for any inference of discrimination. Ms. Edmond charitably can be understood to argue that Mr. Aponte's insensitivity, as well as the breakdown in procedures for addressing complaints, should tinge with an inference of

discrimination all the other incidents that she complained about at Evergreen. But as to most of these incidents, Ms. Edmond provides nothing in her response to the Board's Statement of Undisputed Facts, in her own Counterstatement of Undisputed Facts, or in her Brief in Opposition to Summary Judgment. I have nevertheless reviewed the evidence she has explicitly proffered or discussed, as well as items among the exhibits, as to the six allegations enumerated above.

      i.   *Aponte's speaking Spanish.*

Ms. Edmond presents portions of the testimony of Dr. Bailey, who was the affirmative action officer for the Board at the time Ms. Edmond filed her complaint against Mr. Aponte. (Board Facts ¶¶ 19–21; *see* Ex. 19) Dr. Bailey's investigation found that Mr. Aponte would sometimes talk in Spanish to employees even though they also understood and spoke English. (Bailey Dep. 41:18–3, 53:4–6, 56:12–21) Bailey concluded that this was insensitive to the non-Spanish-speaking African American employees at Evergreen, who could perceive that Mr. Aponte was making derogatory remarks about them. (Bailey Dep. 56:12–21) Dr. Bailey recommended that Mr. Aponte attend sensitivity training. (Bailey Dep. 52:15–18)

Ms. Edmond's claims regarding Dr. Bailey's testimony are substantially undercut by the testimony itself. Bailey stated that in her professional opinion Mr. Aponte's speaking Spanish to some employees was not discriminatory. (Bailey Dep. 52:11–14) She further explained that she nevertheless found it insensitive to non-Spanish-speakers, as stated above. (Bailey Dep. 41:18–42:3; 56:16–21)

The non-racial basis for Aponte's actions is apparent. For his use of the Spanish language, the verdict of "insensitivity" seems to be the most that can be said; there is no evidence that in fact it was intended to discriminate, or was used as a means of expressing racially derogatory comments.

This finding of insensitivity by Aponte does not do much, if anything, to advance the thesis that this incident, alone or in combination with others, had a hidden discriminatory basis.

ii.  *The lack of enforcement of policies regarding discrimination.*

Dr. Bailey testified that when Dr. Gallon became superintendent of the Board, nine months before Edmond filed her complaint against Aponte, the policies regarding complaints about discrimination "went out the window." (Bailey Dep 108–111) The sense seems to be that the new superintendent, Gallon, would be reluctant, or at least not diligent, in processing antidiscrimination complaints. Bailey testified, however, that she and her colleagues properly investigated Ms. Edmond's complaint in accordance with the district's policies. (Bailey Dep. 51:25–52:3, 52:19–55:19, 111:4–7)

Although Bailey reached a result with which Edmond disagrees, she did investigate Edmond's complaint, and sent Edmond a memorandum on June 22, 2009, reporting that the investigation resulted in a determination that her allegations of discrimination were unsubstantiated. (Board Facts ¶ 23; Ex. 28) The superintendent's alleged disregard for district policies does not lend any significant support to Edmond's complaint that she suffered discrimination. This complaint about Aponte was properly investigated by Bailey.

iii.  *Permitting Eagles to leave meeting early.*

The complaint alleges that the "meeting" incident was a simple case of letting the Caucasian Ms. Eagles leave early, while denying the same accommodation to the African-American Ms. Edmond. The email evidence is not consistent with that characterization. Aponte specifically requested that Edmond make arrangements to attend the meeting from 9:00 to 10:25 a.m.. (Ex. 40 at 261) Ms. Edmond responded with a request to be excused from the meeting at 9:30 because she had a lot of other work to do, a request which Aponte denied. (Ex. 40 at 262) An employer may, of course, legitimately require an employee to attend a meeting, even if the employee is busy. From Aponte's point of view, that was the end of the encounter over the meeting; he said nothing about Ms. Eagles.

After the weekend, Ms. Edmond herself recommended that Ms. Eagles, a school nurse, be invited to the meeting; in her email request, Ms. Edmond herself warned that Eagles would only be available until 9:30 a.m. (Ex. 40 263)

Mr. Aponte responded: "No problem and Ms. Eagles can provide additional input – keeping in mind that her time maybe (sic) limited." (Ex. 40 at 263) It is apparent that Edmond was an important part of the meeting; Aponte never invited Eagles to the meeting in the first place, did so only at Ms. Edmond's own suggestion, and saw her only as providing "additional input." (Ex. 40 at 263) Ms. Eagles's limited availability was raised by Ms. Edmond herself as a condition of Eagles's attendance, which Edmond herself had requested.

Even assuming that Aponte drew some distinction here—and it is not clear he did—there is a plausible rationale. Aponte might well have been more concerned about tying up the schedule of a school nurse than he was about the schedule of Ms. Edmond, a social worker who was not meeting with students that day. (Ex. 40 at 263)

In short, it is possible to interpret this whole sequence of events in many ways; none of those ways, however, gives rise to any substantial inference of discrimination. Merely identifying two participants by race is not enough to raise such an inference.

    *iv.*   *Aponte's yelling.*

There is limited evidence, in the form of Ms. Edmond's complaint to the Office of Affirmative Action, that Mr. Aponte raised his voice to her, and more than once. (Ex. 19) Of course, we need not try to find a neutral administrative justification for yelling; the focus must be on whether it betokens discrimination. Even given due latitude, this evidence suggests at best that Aponte behaved unpleasantly, or yelled at many employees without regard to race. Such behavior, assuming it occurred, should not be condoned, but without more it does not suggest discrimination.

For example, one incident mentioned in the evidence involved Ms. Edmond and Milagros Mhenriquez, both of whom Mr. Aponte yelled at both for getting in the way of a parent, even though they did not realize the parent was behind them. (Board Facts ¶ 18; Edmond Response ¶ 18; Ex. 20 at 2–3) Ms. Mhenriquez is Hispanic, not African American. (*See* Compl. ¶ 9)

14

The complaint (¶ 9) alleges that Aponte met with teachers of other races, but not Edmond, to address the issue of his yelling at them. This allegation is not addressed in the statements of facts, the briefs, or the evidence submitted.

  *v.    Sooby.*

The complaint alleges that, when Ms. Edmond quarreled with a Hispanic co-worker, Melinda Sooby, Aponte showed Edmond less support and concern than he had shown Sooby on a previous occasion (Compl. ¶ 8)

The amount of support given to Sooby or Edmond on either occasion is not addressed in statements of facts, the briefs, or the evidence submitted.

  *vi.    Other complaints against Aponte.*

The complaint alleges more generally that Aponte made Edmond's life at Evergreen unbearable until she was transferred, and that he wanted to replace her with a person of Hispanic origin. (Compl. ¶ 11) This allegation is unsupported by specifics, except as to the particular incidents of yelling, speaking Spanish, and so on, already discussed above. In the complaint Edmond alleges that the Hispanic social worker who replaced her had worked at the school previously. No evidence is submitted to suggest that the replacement was unqualified, or less qualified than Edmond. Familiarity with the school is a plausible and nondiscriminatory reason for bringing in this social worker after Edmond was transferred. Again, simply identifying her replacement by race is not enough to establish discrimination.

I consider these pieces of evidence both separately and in combination. They are to some degree simply unsubstantiated, as they are not discussed Edmond's briefs or statements of facts. More to the point, they are almost completely free of any evidence of discriminatory content. Most concern routine grievances that many workers might feel, if not necessarily express. Unpleasant as some of these interactions may have been, there is simply no substantial evidence that race played a role in the administration's decisions or actions.

Ms. Edmond points to no history of pervasive racial stereotyping, harassment, or racial remarks. Nor does she point to any specific evidence of

past discrimination. Individually her allegations are insubstantial or unsupported, and they gain no cumulative weight by virtue of their number.

I cannot find substantial evidence that Ms. Edmond was a victim of race discrimination, or any material factual disputes raised by the proffered evidence that would require a jury determination. Thus, I GRANT defendant's summary judgment motion as to count two for racial discrimination under Title VII.

## 2. Hostile Work Environment (Count 1)

To establish a hostile work environment claim under Title VII, the plaintiff must present evidence that: (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for employer liability. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405 (2006); *see also Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir. 2005).[7]

While there may have been behavior between employees or between Edmond and the Board that was "hostile" in a colloquial sense, that is not what is actionable under Title VII. A legal finding of a hostile work environment under Title VII requires evidence of discrimination based on membership in a protected class. *See id.*

I have discussed above the specific incidents raised by Ms. Edmond, and the evidence underlying them. I have found no substantial evidence of a

_____

[7] The Third Circuit used the language "pervasive and regular" for the second prong, *see Caver* 420 F.3d at 262, but the *Jensen* panel updated the standard to conform with the Supreme Court's formulation of "severe or pervasive." *See Jensen* 435 F.3d at 449 n.3 ("The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here." (internal citations omitted)).

racially based motivation for the incidents about which Ms. Edmond complained. Still less could I find that there was a pervasive pattern of racially based acts or statements that created a hostile work environment.

I will GRANT summary judgment as to count one for a hostile work environment as well.

### 3. Retaliation (Count 4)

The claim of retaliation I view somewhat differently. As to this claim, the proofs do clash, and therefore raise a triable issue. I will deny the Board's motion for summary judgment as to count four for retaliation under Title VII.

Courts use the *McDonnell Douglas* framework to analyze retaliation claims under Title VII that proceed under the "pretext" theory.[8] *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *see also Daniels v. Sch. Dist. of Phila*, 776 F.3d 181, 192-93 (3d Cir. 2015) (use of *McDonnel-Douglas* when there is "no direct evidence of retaliation"). To state a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (as amended Sept. 13, 2006). Once a plaintiff has established a prima facie case of retaliation she "may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not

---

[8] "The 'pretext' and 'mixed-motive' labels are misleading.... Nevertheless, we use the terms 'pretext' and 'mixed-motive' because they are familiar and the introduction of new terminology might lead to even greater confusion." *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016).

.

a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

**Step 1:**

    *vii.    Protected Activity*

A plaintiff alleging retaliation under Title VII is not required to "prove the merits of the underlying discrimination complaint," rather she must have acted "under a good faith, reasonable belief that a violation existed." *Moore*, 461 F.3d at 344. "This standard requires an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." *Daniels*, 776 F.3d at 193-94. Further, "[t]he complaint must allege that the opposition was to discrimination based on a protected category, such as age or race." *Id.* at 193.

On April 3, 2009, while at Evergreen, Ms. Edmond filed a complaint with the Board's Office of Affirmative Action. (Board Facts ¶¶ 19–21; Ex. 19) That form, which she filed with Dr. Bailey, was entitled "Discrimination/Harassment Complaint Form." (Ex. 19 at 1) In it, Ms. Edmond details that Mr. Aponte, Evergreen's principal, was "verbally abusive toward [her]" and "very lenient with other staff members." (Ex. 19 3–4) Although the discrimination was not explicitly identified, a form entitled "Discrimination/Harassment" filed with the Office of Affirmative Action arguably provides sufficient context to establish protected activity under Title VII. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) ("case law has established that opposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context.") At a minimum there is a genuine issue of material fact regarding whether this complaint alerted the Board to her discrimination claims.

Ms. Edmond made two formal EEOC complaints as well.[9] On June 15, 2009, Ms. Edmond filed a charge of discrimination with the EEOC, in which she alleged that Mr. Aponte "harass[ed her], show[ed] favoritism toward staff persons not of [her] race," and that she was replaced by a "Hispanic Social Worker." (Ex. 27 at 1–2; Board Facts ¶ 22) At Cedarbrook, Ms. Edmond also filed a complaint with the affirmative action office (Edmond Facts 31), and an EEOC complaint against the principal, Mr. Asante, and others (Board Facts ¶ 32; Edmond Response ¶ 32).

These complaints were not found in the exhibits, but, to her motion to amend the complaint, Ms. Edmonds attached the charge form of an EEOC complaint from May 13, 2010. (ECF No. 26 at Ex. A) In the 2010 complaint, Ms. Edmond alleged that her roles and responsibilities were reduced after she complained to human resources that she was being bullied and harassed by her colleagues. (ECF No. 26 at Ex. A)[10]

These complaints were not sustained, but that is not a prerequisite to a retaliation claim.

### viii.   Adverse action

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405 (2006). To satisfy the second prong of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable

---

[9] The later dates of these complaints, if the original complaint is not sufficient, would not permit Ms. Edmond's ability to claim her transfer to Cedarbrook as retaliation, as the decision was made before those complaints were registered.

[10] To her motion to amend the complaint, Ms. Edmond also attached the resolution of the 2009 EEOC complaint, dated February 28, 2011. (ECF No. 26 at Ex. B) It stated that "the Commission is unable to conclude that the information establishes a violation of federal law on the part of Respondent" and that Ms. Edmond had 90 days to sue the respondent. (*Id.*) Ms. Edmond timely filed her suit. (ECF No. 1)

worker from making or supporting a charge of discrimination." *Id.* at 68; *accord Daniels*, 776 F.3d at 195; *Moore*, 461 F.3d at 341.[11] This Court must separate "significant from trivial harms" but context also matters. *Burlington*, 548 U.S. at 68–69; *Moore*, 461 F.3d at 346.

Ms. Edmond alleges numerous instances of adverse conduct. When Ms. Edmond made her initial complaint to the affirmative action office, Dr. Bailey's comments could be read to suggest that her complaints would be addressed, not by remedying the situation, but by transferring Edmond to another school. (Board Facts ¶ 21) Ms. Edmond was in fact transferred to Cedarbrook, effective September 1, 2009. (Edmond Response ¶ 21; Exs. G, 24–26) Upon arrival at Cedarbrook, Ms. Edmond was forced to share a small office with Tracey Easley-Card. (Board Facts ¶ 26; Edmond Facts 26–27) Ms. Edmond also claims she was treated hostilely by Mr. Asante, the Cedarbrook principal, based on her complaints of discrimination. (Edmond Facts 30) She supports this claim with a letter Mr. Asante sent to the superintendent on December 10, 2010, asking for her removal from Cedarbrook saying: "I don't understand why she was allowed to come back to Cedarbrook after filing those charges especially since the same behavior had manifested itself in her previous school, prompting her transfer to Cedarbrook in the first place." (Exs. M, 2)

Ms. Edmond also describes hostile behavior by her coworkers, who she claims overdramatized interactions with her in complaints attempting to have her removed. (*See, e.g.*, Edmond Facts 32 (citing Ex. 2); Board Facts ¶¶ 28, 31–34; Edmond Response ¶¶ 28, 31) These complaints by her coworkers led to the March 8, 2011, Board meeting, in which the Board suspended Ms. Edmond indefinitely with pay and mandated that she undergo a psychiatric

---

[11] "[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64.

examination. (Edmond Facts 33; Board Facts ¶¶ 35, 42) Further, when Maria Pellum obtained minutes of that March 8th meeting through the Open Public Records Act, they were not properly redacted. (Board facts ¶ 44; Edmond Response ¶ 43; Edmond Facts 35) As a result, the order that Edmond submit to a psychiatric evaluation was posted on the internet for a number of hours before Pellum noticed it and removed the minutes from her blog. (Edmond Facts 35; Edmond Response ¶ 43)

Each of these instances occurred after Ms. Edmond's protected activity and each could have dissuaded a reasonable person in her position from charging discrimination. *See Daniels*, 776 F.3d at 196.

> ix.   *Causal Connection*

"To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if unusually suggestive." *Daniels*, 776 F.3d at 196 (internal quotation marks and citations omitted). When relying on temporal proximity, the plaintiff will also have to demonstrate that the decision maker accused of taking the adverse action "had knowledge of the protected activity." *Moore*, 461 F.3d at 351. "In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.*

It is undisputed that Ms. Edmond's transfer from Evergreen to Cedarbrook in some sense resulted from her complaint to the affirmative action office about Mr. Aponte. (Board Facts ¶ 21) The letter written by Mr. Asante may be read to confirm this. (Exs. M, 2) Further, the letter confirms that Mr. Asante knew about Edmond's prior complaints. (*Id.*) And that letter was written directly after the incident that led to Edmond's suspension and mandatory psychological evaluation, lending at least some plausibility to plaintiff's theory that all of the actions against her were taken in retaliation for her various

21

complaints. (*See, e.g.*, Edmond Facts 32 (citing Ex. 2); Board Facts ¶¶ 28, 31–34; Edmond Response ¶¶ 28, 31) In short, there is evidence from which a fact finder could infer that the adverse actions complained of by Ms. Edmond were caused by her discrimination charges.

**Steps 2 and 3:** The Board offers a nondiscriminatory reason for Ms. Edmond's transfer from Evergreen to Cedarbrook, and they also deny that the transfer was a materially adverse action. (Board Br. 42–43) Dr. Bailey's statements to Ms. Edmond, as recounted by Ms. Edmond in an email to her union representative, for example, are portrayed as being benign, or for her own good: "[I]f you are telling me that he is harassing you, I am going to have to transfer you . . . If I do not move you then the courts will ask me why I let you stay in an environment where you (sic) feeling harassed." (Board Facts ¶ 21 (citing Ex. 23); Edmond Response ¶ 21) This comment could also, however, be viewed as an admission that the transfer was specifically motivated by Edmond's filing a charge against Mr. Aponte, the Evergreen principal. I do not suggest that either interpretation is correct, but they do create a material issue of fact.

The Board argues that this transfer was not a materially adverse action. Perhaps so; but "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotation marks and citations omitted). Thus whether the transfer is materially adverse presents a genuine issue of material fact.

The Board acknowledges that certain factual claims are contested, but essentially argues that the court need not accept Ms. Edmond's characterization of certain facts: for example, that events leading to the Board's mandate that she receive a psychological evaluation were overdramatized (Board Facts ¶¶ 32–34); that people in the school knew the reason Ms. Edmond was transferred (Board Reply 6); and that she was actually transferred three times by virtue of the three notices (Board Reply 8). All of these matters,

however, pose questions of factual interpretation that I cannot resolve on a motion for summary judgment.

I will therefore DENY the Board's motion for summary judgment as to count four for retaliation under Title VII.

### 4. Constructive Discharge

To prove a constructive discharge claim, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342 (2004).

I have analyzed the evidence above, and I find that it does not raise a material triable issue as to whether working conditions rose to the level of being so intolerable as to amount to a constructive discharge. *See id.* at 147–49 (stating that a constructive discharge claim is graver than a hostile workplace claim and has a higher evidentiary standard). I add that there is no evidence that Ms. Edmond resigned, threatened to resign, or ever said she felt compelled to resign.

Thus, I GRANT summary judgment on count five for constructive discharge.

### C. Invasion of Privacy, False Light (Counts 7 and 8)

Counts 7 and 8 allege invasion of privacy and false light. In count 7, Ms. Edmond alleges that (Cedarbrook) Principal Asante and Dr. Bailey discussed her personnel file outside her presence. (Compl. ¶ 49) In count eight Edmond alleges that her coworkers and Asante overdramatized interactions with her in complaints about her. In her supplemental complaint, painted her in a false light as an unreasonable or unstable person. Edmond alleges that the Board's minutes in which she was mandated to have a psychiatric examination were published without redactions, and that this had a similar effect. (Supp. Compl. ¶ 10–27)

I dispose of a threshold issue. In count 8 Ms. Edmond cites a New Jersey statute barring "False Complaints of Unprofessional Conduct." NJSA § 2A:47A–1; (*see* Compl. ¶ 51). That statute requires a showing that a person "falsely and

23

maliciously and without probable cause" complained of unprofessional conduct against a member of a profession requiring a license. *Id.* A claim under the statute is "in the nature of an action at law for malicious prosecution and requires proof of the same well-established elements of the disfavor[ed] common-law claim." *Thigpen v. City of E. Orange*, 974 A.2d 1126, 1133 (N.J. Super. App. Div. 2009) (citing NJSA § 2A:47A–1). Those "well-established elements" of a malicious prosecution action require that a plaintiff "establish that the original suit (1) was instituted without reasonable or probable cause; (2) was motivated by malice; (3) terminated favorably to the plaintiff in the malicious prosecution action; and (4) resulted in a "special grievance" to the plaintiff." *Giri v. Rutgers Cas. Ins. Co.*, 641 A.2d 1112, 1115 (N.J. Super. App. Div. 1994).[12] "The absence of any one of these elements is fatal." *Id.* at 1115–16. Ms. Edmond provides no evidence that complaints terminated in her favor; some, for example, resulted in the Board's requiring her to undergo a psychiatric evaluation. (Edmond Facts 32–33; Board Facts ¶¶ 33–35) Ms. Edmond has not marshaled facts and evidence that would make out a claim under this statute.[13]

Instead, I will construe counts seven and eight under New Jersey tort law: count seven for improper publication of private facts and count eight for false light invasion of privacy. *See Rolax v. Whitman*, 175 F. Supp. 2d 720, 726 (D.N.J. 2001), *aff'd*, 53 F. App'x 635 (3d Cir. 2002) ("The four distinct torts which are grouped under "invasion of privacy" are: (1) intrusion; (2) public disclosure of private facts; (3) placing a plaintiff in a false light in the public

---

[12] A similar test cited by the Third Circuit lacked the fourth "special grievance" element stated above. *See Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 248 (3d Cir. 2001).

[13] In her brief in opposition to summary judgment, Ms. Edmond invokes the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 29 U.S.C. 1981, but neither the complaint nor the supplemental complaint, when discussing the privacy counts, contains any cause of action under federal statutes, so I do not consider it.

eye; and (4) appropriation of a plaintiff's name or likeness for defendant's benefit." (citing *Rumbauskas v. Cantor*, 649 A.2d 853, 856 (N.J. 1994))).

As to these claims, the only evidence cited by Ms. Edmond concerns the internet publication of the Board minutes without redaction of the order that she undergo a psychiatric evaluation (*see* Supp. Compl. ¶¶ 10–27; Edmond Response ¶ 43; Edmond Facts 35–36; Edmond Br. 60–64) and the letter from Mr. Asante (Exs. M, 2). At any rate, that seems to be the thrust of these claims.

     *i.*    *Improper publication of private facts (Count 7)*

"The tort of improper publication of private facts occurs when it is shown that the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized." *G.D. v. Kenny*, 15 A.3d 300, 320 (N.J. 2011) (internal quotation marks and citations omitted). "It is important to stress that this privacy tort permits recovery for *truthful* disclosures." *Romaine v. Kallinger*, 537 A.2d 284, 292 (N.J. 1988).

The Board apparently agrees that the information should have been redacted. (Board Br. 47) Whether the Board is responsible for the minutes' being published without redactions presents a material issue of fact. Ms Pellum claimed in her deposition that the minutes were redacted in some way when she received them, but that the redaction was done poorly. She also testified that Gary Ottman, the Board's secretary who sent her the minutes, told her there was a computer glitch that led to the incomplete redaction. (Pellum Dep. 20–25) The Board, on the other hand, claims that the minutes they sent were redacted, and that therefore Ms. Pellum bears responsibility for revealing any private information. (Board Facts ¶ 44–45; Board Br. 47)

An obvious issue of fact is presented. Thus I will DENY the motion for summary judgment as to count seven, solely insofar as it relates to the publication of the order for a psychiatric exam.

ii.    *False Light (Count 8)*

To prove the tort of false light, a plaintiff must show "(1) that the false light in which [she] was placed would be highly offensive to a reasonable person and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Durando v. Nutley Sun*, 37 A.3d 449, 458 (N.J. 2012) (internal quotation marks and citations omitted). "[A] fundamental requirement of the false light tort is that the disputed publicity be in fact false, or else at least have the capacity to give rise to a false public impression as to the plaintiff." *Romaine*, 537 A.2d at 290 (internal quotation marks and citations omitted).

"[I]t is for the court first to determine whether the criticized matter is capable of the meaning assigned to it by plaintiff, and whether that meaning is highly offensive to a reasonable person." *Romaine*, 537 A.2d at 290. The release of information that Ms. Edmond was mandated to undergo a psychiatric evaluation based on "recent behavior and conduct [that] shows evidence of deviation from normal physical or mental health" (Ex. K), appears to the Court to comply with the "highly offensive" standard.

The records published by Ms. Pellum on her blog, if accurate as an account of the Board meeting, could still be false as to Ms. Edmonds. The Board's minutes state that they had sufficient evidence based on coworker complaints to find a "genuine and documented concern regarding Edmond's mental health." (Ex. K) Ms. Edmond argues that the minutes gave the public "the opportunity to form the impression [that she] was psychiatrically impaired," which she denies. (Edmond Response ¶ 43)

Here, too, an issue of fact is presented. I will therefore DENY the summary judgment motion as to count eight for false light, solely insofar as it relates to the publication of the order for a psychiatric exam.

26

### D. Bad Faith

"Bad faith" is not a cause of action in New Jersey. Ms. Edmond provides no support for this count and does not mention it in her briefing. Thus, I GRANT summary judgment on count nine for bad faith.

### E. Intentional Infliction of Emotional Distress

"[T]o establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988). "[U]nder New Jersey law, intentional infliction of emotional distress comprehends conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Subbe-Hirt v. Baccigalupi*, 94 F.3d 111, 114 (3d Cir. 1996) (citing Restatement (Second) of Torts § 46 comment d).

While Ms. Edmond's evidence portrays a workplace where coworkers behave rudely towards one another, the conduct does not reach the extreme level required for proving a claim of intentional infliction of emotional distress. "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *see also GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612–13 (Tex.1999).

As to the release of the unredacted minutes, however, there is a genuine issue of material fact as to whether it was intentional or "reckless[] in deliberate disregard of a high degree of probability that emotional distress will follow." *Buckley*, 544 A.2d at 863; (*see* Supp. Compl ¶¶ 23–27).

Thus, I GRANT IN PART summary judgment as to claim ten for intentional infliction of emotional distress, but DENY summary judgment solely

insofar as count ten relates to the publication of the order of a psychiatric exam.

### III.   CONCLUSION

For the reasons set forth above, I **GRANT** in part and **DENY** in part the Board's motion for summary judgment. The motion is GRANTED as to counts one, two, three, five, six, and nine. The motion is DENIED as to count four, as well as counts seven, eight, and ten only as they relate to the publication of the order for a psychiatric exam.

Dated: March 18, 2016

_____
**Hon. Kevin McNulty**
**United States District Judge**